

The Rosewood  
170 College Street  
Macon, Georgia 31201  

(478) 841-9007 tel  
(478) 841-9002 fax  
cooperbarton.com

KENNETH E. BARTON
KEB@COOPERBARTON.COM

June 28, 2019

**VIA CERTIFIED MAIL &**
**VIA FACSIMILE: (404) 562-6909**
Equal Employment Opportunity Commission
Atlanta District Office
100 Alabama Street, S.W., Suite 4R30
Atlanta, Georgia 30303

Re: **Charge of Discrimination**
*Rachel J. Mosby v. City of Byron, Georgia*
Equal Employment Opportunity Commission (Charge No. TBD)
*Cooper, Barton & Cooper File No.: 15918.0001*

To Whom It May Concern:

Our law firm has been retained to represent Ms. Rachel J. Mosby, and we wish to file a Charge of Discrimination on her behalf. Enclosed, please find a true and correct copy of a Notice in which Chief Mosby has designated me and our law firm as her legal representative. The Equal Employment Opportunity Commission will find that, while Chief Mosby was employed with the City of Byron, Georgia, she was subjected to harassment and hostile work environment, disparate treatment, and termination due to her sex and disabilities, in violation of Title VII of the Civil Rights Act and the Americans with Disabilities Act.

Ms. Mosby (hereinafter, "Chief Mosby") was employed as the Chief of the Fire Department, located at 103 GA Highway 49 South, Byron, Peach County, Georgia 31008. The City of Byron was Chief Mosby's employer, which is located at 401 Main Street, Byron, Peach County, Georgia 31008. The City of Byron has employed in excess of fifteen (15) employees for each working day in 2019 and in previous years.

Chief Mosby identifies as a transgender female, and she was one of the first openly-transgender fire chiefs in the world, if not the very first. As described herein, Chief Mosby also suffers from several conditions, especially in her right ankle and lower back-lumbar, that substantially limit her major life activities and are considered disabilities under the Americans with Disabilities Act. Moreover, Chief Mosby became further disabled in Spring 2019, when she sustained additional injuries to her left hip, left wrist, and mid-back thoracic in an on-the-job motor vehicle accident, in which Chief Mosby was not at fault.

Chief Mosby began her employment with the City of Byron on September 4, 2007, as the City's Fire Marshal. At that time, the City was served by the Byron Volunteer Fire Department. In January 2008, the City established its first professional Fire Department, and, shortly thereafter, Chief Mosby was appointed as its first Chief. Prior to Chief Mosby's tenure, the City had been rated by the Insurance Service Office ("ISO") as Class 7. A fire district receives an ISO rating from 1-10, with Class 10 being the lowest, which

indicates that the fire district failed to meet ISO minimum requirements. These ratings directly impact property owners' and municipalities' insurance rates and premiums, and can, thereby impact growth.

During her eleven years as Chief, Chief Mosby's performance was exemplary. Chief Mosby oversaw the growth of the number of professional employees in the Fire Department, contributed to the drafting of proposed City Ordinances, developed Strategic Plans, and improved the quality of the Department's equipment, among other accomplishments. Moreover, Chief Mosby successfully lead the City through two ISO surveys and lowered the City's ISO rating from Class 7 to Class 4 within only four years. She believes that the City will soon be rated as Class 3 due to her efforts. Prior to the events described herein, Chief Mosby only recalls receiving one written reprimand, although she was not otherwise disciplined, for using a profane word while on the scene of a fire. In the last performance evaluation that she received, Chief Mosby's performance was described as exemplary, with very few areas, if any, identified for improvement.

Unbeknownst to her employer, Chief Mosby had been struggling with gender dysphoria for most of her life. In or around Fall 2016, she began her medical transition in order to allow herself to properly present as female. Initially, Chief Mosby attempted to transition quietly; however, in Summer 2017, Chief Mosby realized that other City employees were circulating rumors about Chief Mosby and her appearance. In September 2017, Chief Mosby felt that it was necessary to "come out" (or, "go public," in her words) to her employees. Soon thereafter, Chief Mosby also came out to the City Administrator, the Mayor, and her fellow department heads, and Chief Mosby would describe herself as presenting entirely as female in or around January 2018.

While she initially thought that this news had been well-received, Chief Mosby often experienced microaggressions and other intentional harassment from her employees, fellow department heads, and even members of the City Council. Shortly after she came out, one Councilmember told Chief Mosby that he did not have a problem with her transition but that he would if she showed up to work in a dress. Another Councilman told Chief Mosby that the City could still use a performance review to get rid of her.

Subsequently, when Chief Mosby was conducting interviews for an open position, the City enacted a hiring freeze *the day after* Chief Mosby had interviewed a qualified candidate who also happened to be transgender, although the City allowed the Public Works and Police Departments to continue hiring. On a number of instances, the Chief of Police and members of City Council intentionally referred to Chief Mosby with male pronouns in their communications with her and statements to the media. In an October 2018 meeting of department heads, the Police Captain intentionally referred to Chief Mosby as male a number of times, and when Chief Mosby corrected the Captain, he responded "whatever dude." Although the City Administrator (and the City's designated equal employment officer) heard the Captain's remarks, he refused to take any corrective or disciplinary action or accept Chief Mosby's complaint. There were other instances when Councilmembers either blatantly refused to speak to Chief Mosby, and even one Councilman who left the City's designated table as soon as she sat down at a local Chamber of Commerce dinner.

The EEOC will note that the treatment of Chief Mosby began to change drastically and dramatically around the time she was featured in a story by the local press. On April 29, 2019, local outlet 13WMAZ

ran a story, on both its evening news broadcast and online, specifically about Chief Mosby coming out as transgender. A true and correct copy of the story is attached hereto and marked as "Exhibit A." Critically, the news outlet approached Chief Mosby about participating in the interview, and there was nothing in City policy or practice that prevented Chief Mosby from making public statements about this, or other topics on prior occasions.

For almost all of Chief Mosby's tenure, she was not required to wear a uniform. Instead, Chief Mosby was permitted to wear professional attire such as khaki pants, button-up shirts, and suits and ties, and the City Budget generally included a line item for a clothing allowance. In 2018, the City budgeted $1,200 for Chief Mosby to use to purchase said professional attire. In Spring 2018, Chief Mosby sought to purchase professional attire that is considered more-traditionally female. She spent approximately $600 on clothing, which had been approved by the appropriate person. However, shortly after Chief Mosby was seen wearing a skirt to work for the first time, the City issued her a written reprimand for allegedly making an unauthorized purchase. The City also required that Chief Mosby pay back the money. Unfortunately, a City employee decided to leak this information to the press. Critically, Chief Mosby only started wearing a uniform before she came out because this unisex option helped her manage her dysphoria. Around the same time that Chief Mosby used her clothing allowance, another female employee of the City was also permitted to make similar purchases, but she was not disciplined or otherwise required to pay anything back. Moreover, after Chief Mosby wore the skirt to work, the City changed its policy, making it mandatory that firefighters wear uniforms. The policy change appeared to target Chief Mosby, as the Police Chief and detectives remained exempted from this policy and allowed to wear non-uniform, professional attire.

In Summer 2018, one of Chief Mosby's reserve firefighters called Chief Mosby a "he-she" to her face. Because of this incident, as well as a prior complaint of sexual harassment made by another employee against the same individual, Chief Mosby decided to terminate the reserve firefighter. Chief Mosby received approval from the City Attorney to terminate the employee, and her decision was upheld by the City Administrator. However, the City granted the reserve firefighter's request to appeal in November. Despite initially upholding the termination, the City Administrator, now as the officer hearing the appeal, reversed the termination and reinstated the reserve firefighter.

The City Administrator notified Chief Mosby of the appeal via a November 13, 2018 email, and he initially stated that the City would follow the appeal procedures in an unapproved personnel policy that had been proposed but in no way approved. This was the first time that Chief Mosby had seen the proposed revisions – revisions that took away *only* department heads' right to appeal any disciplinary actions taken against them or other employees. Not only did the *old* policy not actually allow for reserve firefighters (i.e., volunteers) to appeal a termination, the City Administrator told Chief Mosby that she could not appeal the reinstatement because of the *new* policy not yet in effect. The new policy was enacted through an ordinance passed and made effective on January 14, 2019. A true and correct copy of the newly-enacted personnel policy is attached hereto and marked as "Exhibit B."

On June 4, 2019, the City Administrator sent Chief Mosby an email asking to meet with her that afternoon. When Chief Mosby arrived, the City Administrator provided her with notice of her termination, effective immediately. This was the first indication that the City ever gave her that she was going to be terminated, or that her job was in jeopardy in any way. A true and correct copy of the termination letter is

attached hereto and marked as "Exhibit C." Chief Mosby was immediately escorted to her office by the Chief of Police, where she found that the locks had already been changed, and she was forced to pack all of her belongings and leave the premises that afternoon.

While the City stated that the termination was for lack of performance, the examples that it cites are inaccurate and/or not indicators of her lack or performance, or much less, valid reasons for termination. The reasons provided are as follows:

- First, the City states that Chief Mosby failed to "release new/renewal business licenses for approval in a timely manner." In late 2018, the City incorporated new software for the Fire Department to use for its part of the business licenses approval process. Because of the new system, the Fire Department was required to enter all information about existing business licenses into the system by hand. Chief Mosby has long been expressing her concerns about the delays this was causing and made suggestions on how the process could be improved, as the City Administrator had instituted a new workflow process without consulting the department heads and was specifically cumbersome on the Fire Chief. The City failed to take her suggestions, and Chief Mosby and one other employee were forced to enter this information into the system manually when they were not performing their regular duties. Critically, the City was aware that Chief Mosby's Department was understaffed due to a hiring freeze and that her personal schedule was limited due to frequent physical therapy sessions that she was receiving for a work-related accident. This is one example of how the City took efforts to make Chief Mosby's duties difficult or impossible, especially in light of Chief Mosby's disabilities and work-related injuries. Moreover, Chief Mosby was never counseled, coached, warned, nor given a negative evaluation on this issue.

- Second, the City alleges that Chief Mosby only attended five of the classes offered during a Georgia Association of Fire Chiefs conference from March 30 through April 3, 2019. The City alleged that this was a waste of its resources. However, the EEOC will find that Chief Mosby took full-advantage of training opportunities and conferences that she attended, including at this conference. The evidence will show that this allegation is not true, and the City never even asked Chief Mosby about the accuracy of this information. Moreover, the evidence will reflect that this inaccurate information about her conference attendance was reported by at least two individuals with discriminatory animus against Chief Mosby.

- Third, the City states that Chief Mosby failed to maintain the Arson Investigator certification, as required by her job description. However, Chief Mosby maintained all necessary training and certifications, and in evidence will show that the City never actually required this certification for the position.

In fact, the inclusion of the requirement for a fire investigator certification in the fire chief job description was a mistake *made by Chief Mosby, herself,* when she wrote the original fire chief job description adopted by the city. It was an error that she attempted to correct over the years; this was recognized by her superiors, as evidenced by her never having been notified that this was an issue during her nearly twelve-year tenure, until her termination. Moreover, the evidence will show that the City officially removed fire investigations from being one of the Fire Chief's duties in 2009 and 2010.

Due to the January 2019 change in the personnel policy, Chief Mosby does not have the right to request any reconsideration, appeal, or review of her termination. She is the first department head who has been discharged by the City over the last several years, and she is the first and only City employee who has been terminated without the right to request an appeal. In hindsight, the City had taken countless actions in late 2018 through 2019 that made it apparent that the City planned to remove Chief Mosby. Since her termination, the City has taken additional steps to humiliate Chief Mosby and further damage her career. One Councilman has given interviews to the local media in which he has *intentionally* referred to Chief Mosby using both female and male pronouns.

Accordingly, for the above and foregoing reasons, Chief Rachel J. Mosby seeks to file a Charge of Discrimination against the City of Byron, Georgia, as follows:

(1) Beginning in January 2018 and continuing through June 4, 2019, Chief Mosby was subjected to harassment, hostile work environment, and disparate treatment due to her sex and gender identity, in violation of Title VII of the Civil Rights Act;

(2) On June 4, 2019, Chief Mosby was terminated due to her sex and gender identity in violation of Title VII of the Civil Rights Act;

(3) On June 4, 2019, Chief Mosby was terminated due to her disabilities, as described herein, in violation of the Americans with Disabilities Act; and,

(4) As described herein, Chief Mosby was terminated for reasons connected to her disabilities known to her employer, without first being provided with a reasonable accommodation, in violation of the Americans with Disabilities Act.

Please do not hesitate to reach out to us if you have any questions, or need additional information, documentation, or the names of witnesses. We appreciate the EEOC's time and attention to this matter.

Sincerely yours,

KENNETH E. BARTON

KEB/nagm
Enclosures
cc:   Ms. Rachel J. Mosby (via email)
      Joshua A. Carroll, Esq. (via email)

159180001.L03.EEOC Charge



The Rosewood  
170 College Street  
Macon, Georgia 31201  

(478) 841-9007 tel  
(478) 841-9002 fax  
cooperbarton.com  

## Notice of Designation of Attorney

Effective Date: June 6, 2019

I, RACHEL MOSBY, do hereby designate the individual(s) and law firm(s) named below to act as my attorney/representative in all matters pertaining to my formal Charge of Discrimination to be filed with the Equal Employment Opportunity Commission.

**Charging Party:**  
Rachel Mosby  

**Attorney/Representative:**  
Kenneth E. Barton, Esq.  
COOPER, BARTON & COOPER, LLP  
170 College Street  
Macon, Georgia 31201  
(478) 841-9007- telephone  
(478) 841-9002- facsimile  
keb@cooperbarton.com  

I understand that I, or any other individual that I so delegate, may cancel this notice, and that I am responsible for notifying the Office of Equal Employment Opportunity in writing in the event of a cancellation.



_____  
RACHEL MOSBY  

_____  
DATE  10 Jun 2019

   

# 'I've never seemed happier in my life:' Transgender Byron fire chief shares her journey



Transgender Byron fire chief shares journey

Author: Suzanne Lawler
Published: 11:36 PM EDT April 29, 2019
Updated: 11:51 PM EDT April 29, 2019

LOCAL   1 ART

**CHAPTER 1**
'It's important to have visibility for those that can't'

**EXPLORE**



CHAPTER 1

**EXHIBIT A PAGE 1 OF 4**

# 'It's important to have visibility for those that can't'

In the small Peach County town of Byron, the same person has led the fire department for the last 11 years.

Same leadership, same skills on the job, but one notable change -- Chief Rachel Mosby is transgender, taking the steps to go from a man to a woman during her time in one of the city's top jobs.



**RELATED:** Here's the 'Good News' that happened in Central Georgia: April 21-27

"It was just organized chaos and everybody working together putting a fire out, and I've been doing it ever since," Rachel said. For most of her working career and half her life, Rachel Mosby has worn a uniform. "In 2004, I became a district chief," she recalled.

She came to Byron three years later as a fire marshal. "In 2008, they nominated and voted for me to be the fire chief," she said.



She was a different person back then. "It started in 2016, I started medically transitioning," Rachel said.

Rachel's transgender. Uncomfortable as a man, she began the journey to becoming a woman. "I mostly grew up in a small town, smaller than the one I live in now, and information wasn't available and it wasn't something you just went and asked grownups about. There just wasn't information sources for this stuff," she explained.

We asked Rachel about the man she was before the transition and she didn't really want to go into that. For her, he simply doesn't exist anymore.

But he existed to the guys at the fire station, and in a profession where very few women, much less transgender individuals, fill the ranks, Rachel had some intense conversations ahead of her.

**EXHIBIT A PAGE 2 OF 4**



" needed to be ab e to trust them w th th s the way that ask them to trust me every day when they come to work," Rache sa d. "These peop e are ke my fam y here at the fire department. We're a fam y, and t's the same th ng ke go ng to fam y w th that, and th nk that the major ty of the re uctance on my part had to do w th my own underest mat on of the r character, and n the end, t wound up not be ng as b g of a dea as thought t was."



You can't h de trans t on ng from a man to a woman, and as the fire ch ef, Rache had to expand those conversat ons to c ty department heads -- a perce ved tough task n a sma town n the B b e Be t. "What 've found s that a es and fr ends have come from some of the most unexpected p aces," she sa d.



**'I've never seemed happier in my life:' Transgender Byron fire chief shares her journey**

*LOCAL*

' t's mportant to have v s b ty for those that can't'

CHAPTER 1




And then she went one step further -- she ta ked to us. She d dn't have to share her story, but she fe t a need. " t's mportant to have v s b ty for those that can't. There's a ot of fo ks that are unab e to be v s b e w th the r trans t on because of a ot of d fferent reasons," she sa d. "And then there's peop e that are afra d of everyth ng that goes w th t -- t's not a ways smooth for everyone that fo ows th s path."

These days, Rache says she s at peace, comfortab e n her own sk n, and fee s proud to take a eadersh p ro e n the transgender commun ty.

"Everybody who knows me or has known me for some t me says 've never seemed happ er n my fe," she sa d w th a sm e.

**EXHIBIT A PAGE 3 OF 4**



Transgender fire chief on career at fire department (Pt. 3)

**RELATED:** Here's the 'Good News' that happened in Central Georgia: April 14-20

Rachel has served on several panels in the transgender community. As for logistics in the firehouse, the sleeping arrangements haven't changed -- the guys and Rachel just change clothes in the bathroom. Both of the bathrooms are unisex.

© 2019 WMAZ-TV. All Rights Reserved.

**EXHIBIT A PAGE 4 OF 4**

# City of Byron
# Personnel Policies

| | |
|---|---|
| Policy Number: 8.1 | Subject: Disciplinary Actions |
| Effective Date: April 29, 2005 | Number of Pages: 6 |
| Revised Dates: March 15, 2012 | Distribution: All Employees of |
| December 11, 2012 | the City of Byron |
| August 8, 2016 | |
| January 14, 2019 | |
| Special Instructions: None | |

AN ORDINANCE OF THE MAYOR AND COUNCIL OF THE CITY OF BYRON, GEORGIA TO REPEAL POLICY NO. 8.1 OF THE CITY OF BYRON PERSONNEL POLICIES (SUBJECT: DISCIPLINARY ACTIONS) AND SUBSTITUTE IN ITS PLACE A NEW PERSONNEL POLICY NO. 8.1 TO PROVIDE FOR DISCIPLINARY ACTIONS AGAINST AND APPEAL PROCEDURES FOR EMPLOYEES, TO DISTINGUISH THE STATUS OF APPOINTIVE OFFICERS, DEPARTMENT HEADS AND DIRECTORS, AND TO PROVIDE FOR NAME CLEARING HEARINGS, AND FOR OTHER PURPOSES.

**BE IT ORDAINED BY THE MAYOR AND COUNCIL** of the City of Byron, Georgia, and it is hereby so ordained that Policy No. 8.1 of the City of Byron Personnel Policies is hereby repealed in its entirety and a new Policy No. 8.1 (Subject: Disciplinary Actions) substituted in its place as follows:

**A.   GENERAL**

It shall be the duty of all City employees to comply with and assist in carrying out the provisions of the City's personnel rules and regulations. No employee shall be disciplined except for violation of established rules and regulations, and such discipline shall be in accordance with procedures established by the personnel rules and regulations.

It shall be the duty of each employee to maintain high standards of conduct, cooperation, efficiency, and economy in his/her work with the City. Whenever work habits, attitude, production, or personal conduct of any employee falls below the accepted norm for all employees, supervisors should point out those behavioral deficiencies to the employee at the time they are observed or a reasonable time thereafter. Corrections and suggestions should be presented in a constructive and helpful manner in an effort to elicit cooperation and goodwill from all employees. Supervisors shall assist employees in attaining competence through on-the-job training and additional training as required. Whenever possible, oral and/or written warnings shall precede formal discipline.

**B.   EMPLOYEE AND SUPERVISOR RESPONSIBILITIES**

(1) It is the duty of every employee to correct any faults in performance when called to his/her attention and to make every effort to avoid conflict with the City's rules and regulations.

(2) It is the duty of every supervisor to detect cases of improper or inadequate performance

EXHIBIT B PAGE 1 OF 7

with the employee in order to correct deficiencies and to avoid the need to exercise disciplinary action. Discipline shall be in the hands of the Department Head and should be of an increasingly progressive nature. The steps of progression shall generally be oral reprimand, written reprimand, suspension, demotion and finally dismissal. However, this is not to say that the Department Head should not immediately terminate an employee for any one of the reasons listed in this policy. Discipline should correspond to the offense.

C.  **DISCIPLINARY ACTION**

Disciplinary action shall be taken as expeditiously as possible and as soon as a final determination is made that a violation has occurred. This normally should not require more than five days after the occurrence is established or after a determination is made that discipline is to be based on multiple violations which have occurred over a period of time. If disciplinary action is delayed for administrative review or investigation purposes, the employee should normally be notified and advised that the Imposition of disciplinary action is being considered.

D.  **GROUNDS FOR DISCIPLINARY ACTION**

The following are declared to be grounds for oral reprimand, written reprimand, demotion, suspension, or removal of an employee. (However, this is not intended to be an exhaustive listing of all grounds for disciplinary action):

(1) conviction of a felony or other crime involving moral turpitude or involving alcoholic beverages or drugs.

(2) Incompetent, negligent or inefficient performance of the duties of the position held.

(3) Absence without leave.

(4) Insubordination which creates a serious breach of discipline.

(5) Intentional failure or refusal to carry out instructions.

(6) Misappropriation, destruction, theft, conversion, or misuse of City property.

(7) Employee subsequently becomes physically or mentally unfit for the performance of his/her essential functions.

(8) Acts of misconduct while on duty.

(9) Willful disregard of orders.

(10) Habitual tardiness and/or absenteeism.

(11) Falsification of any information required by the City for employment purposes.

(12) Failure to properly report on-the-job accidents or personal injuries.

    (13)    Neglect or carelessness resulting in damage to City property or equipment.

    (14)    Repeated convictions during employment of misdemeanor and/or traffic charges.

    (15)    Introduction, possession, or use on City property or in City equipment, or working under the influence of intoxicating liquor, wine, malt beverages, or any schedule drugs without prescription.

    (16)    Wantonly offensive conduct or language toward the public or city officials or employees.

    (17)    Violations of the City Charter, City Ordinances, personnel rules and regulations or department rules; and

    (18)    An accumulation of violations or infractions which indicate an employee's inability or unwillingness to conform to appropriate standards of performance or conduct.

    (19)    Failure to become or remain approved as an acceptable driver by the city's insurer whenever driving a city owned vehicle is required for the position.

Employees shall be subject to the following alternatives for disciplinary action as determined by their department head; or, in the case of department heads, as determined by the City Administrator:

    (1)    Written reprimand;

    (2)    Reduction in pay to the extent permitted by law;

    (3)    Suspension without pay for up to 90 days or shift equivalent to the extent permitted by law;

    (4)    Demotion;

    (5)    Discharge.

### E.    WRITTEN REPRIMANDS

    (1)    <u>Notice:</u> The employee to be reprimanded shall be provided with a written notice of reprimand stating any and all reasons for the reprimand. A reprimand need not include statements of witnesses or other supporting documents, but shall set forth the circumstances in sufficient detail to permit the employee to understand the nature and basis of the action. Written responses shall be placed in the employee's personnel file.

    (2)    <u>Response:</u> The employee shall have the right to submit a written response to the reprimand within fifteen (15) days of receipt of notice of written reprimand. The employee's response will be placed in the employee's personnel file.

### F.    NOTIFICATION OF SUSPENSION, REDUCTION IN PAY, DEMOTION, AND TERMINATION

The employee against whom disciplinary action is taken shall be provided with a written notice stating the reasons for the disciplinary action. The written notification should contain the effective date of the action, the specific charges or reasons for the action, the specific action, and a statement informing the employee of his or her right to appeal the action as well as the procedure for doing so. The employee shall also

receive notification that failure to submit an appeal will result In the loss of the opportunity to appeal the adverse action.

### G.  COMPUTATION OF TIME

When a period of time measured in days, weeks, months, years, or other measure of time except hours is prescribed for the exercise of any privilege or the discharge of any duty, the first day shall not be counted, but the last day shall be counted; and, if the last day falls on a Saturday, Sunday, or legal holiday, the party having such privilege or duty shall have through the next day which is not a Saturday, Sunday or legal holiday to exercise the privilege or discharge the duty. When a period of time is less than seven (7) days, intermediate Saturdays, Sundays and legal holidays shall be excluded in the computation.

### H.  APPEALS

(1)  Filing an Appeal

  a.  Except as otherwise provided in this policy, any employee, other than a department head that reports directly to the City Administrator, who is disciplined shall have the right to appeal such disciplinary action to the City Clerk who will schedule a hearing with the City Administrator. The appeal shall be in writing and must be received in the Office of the City Clerk within five (5) days following the notice confirming imposition of discipline. Department heads that report directly to the City Administrator are not entitled to an appeal.

  b.  There shall be no right for any employee to appeal a written reprimand or for a probationary employee to appeal any disciplinary action.

(2)  Hearing

  a.  The City Administrator shall conduct an informal fact-finding hearing. Extensions of time until the hearing or continuances of hearings may be approved by the City Administrator.

  b.  The employee who has requested review shall proceed first. The employee shall offer testimony and documentary evidence which rebuts the reason given for the proposed adverse action and/or which challenges the severity of the proposed adverse action. The employee bears the burden of establishing that the reason or the adverse action is untrue and/or that the severity of the adverse action is inappropriate given the facts and circumstances.

  c.  The employee's supervisor or Department Head shall next be permitted to offer evidence in support of the proposed action and/or in response to evidence offered by the employee.

  d.  A hearing may be continued by the appointing authority pending the need to gather additional information.

  e.  A designee may be appointed to hear the appeal at the discretion of the appointing authority.

  f.  In arriving at a decision, the City Administrator shall consider the testimony and documents presented in the hearing as well as any other relevant information. The City Administrator may approve, reject, or modify the proposed adverse action and make a written decision within five (5) business days of the hearing. This decision shall be final.

(3) Any employee, including department heads and appointive officers, who alleges hey have been subject to an action that damages their name, reputation, or integrity, may request a public name-clearing hearing before the Mayor and Council. Such hearing may be requested by filing notice with the City Clerk who will schedule a hearing to include the affected employee. In the event the City Clerk shall desire such a hearing, he or she shall submit the notice directly to the mayor. For good cause, the Mayor and City Council can continue a hearing for up to 20 days past its originally scheduled date. Such hearings shall not serve as appeals of the appointing authority's decision regarding continued employment or discipline.

I. **EMPLOYEE INDICTED, CHARGED OR BOUND OVER**

(1) If an employee is arrested and bound over to a grand jury or indicted for a felony or serious misdemeanor, the department head shall consult with the City Attorney to determine the appropriate status of the employee during the pendency of the criminal charges.

(2) Normally, if the conduct resulting in the criminal charges is also an offense against the employment relationship with the city, the appropriate disciplinary action shall be instituted and the employee discharged if appropriate.

(3) If the conduct resulting in the criminal charges does not relate directly to the duties of the position held, but is of a serious and aggravated nature so as to interfere with the employer-employee relationship or embarrass the city, the employee may be suspended pending disposition of charges.

(4) If the conduct resulting in the criminal charges is completely unrelated to city employment and will not be likely to damage the employment relationship, the employee should usually be allowed to continue working.

(5) An employee suspended pending the disposition of criminal charges shall not report to work or be present in his/her normal work site during the period of suspension.

(6) If the criminal charges are disposed of in favor of the employee, he/she shall be reinstated with back pay from the date of suspension less any compensation received from any other source during the period of suspension.

(7) If a suspended employee is not available for work within 30 days of the institution of criminal charges, the position may be declared vacant and filled in the normal course of filing vacancies. Any employee who is unable to report to work for reasons other than suspension is subject to the requirements specified for absenteeism.

### J.   PROBATIONARY EMPLOYEES

Employees who have not completed twelve months of employment are probationary employees and have no guarantee of continued employment and no protected property interest or rights requiring procedural safeguards. Probationary employees may be terminated for any reason with no right to a due process hearing. In order to terminate a probationary employee, the department head must deliver a notice to the employee that his/her employment is terminated as an "unsatisfactory probationary employee", and send a copy to the City Clerk.

### K.   APPOINTIVE OFFICERS AND DIRECTORS

Pursuant to Article III, Section 3.10 (e) of the City Charter, all appointive officers and directors shall be employees at-will and subject to removal or suspension at any time by the appointing authority unless otherwise provided by law or ordinance.

**SO ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF BYRON, GEORGIA**, on the 14th day of January, 2019.

**CITY OF BYRON, GEORGIA**

Mayor:

Lawrence C. Collins

Michael L. Chidester, Mayor Pro-Tem

James Richardson, Council Member

Russell G. Adams, Council Member

Michael S. Chumbley, Council Member

(absent)
Alan C. Dorsey, Council Member

Attest:

Telina Allred, City Clerk

**EXHIBIT B PAGE 6 OF 7**






# The City of Byron

Chief Mosby

███████████
███████████

Chief Mosby,

I regret to inform you that your employment with the City of Byron is hereby terminated immediately. The City no longer has confidence in your ability to lead our Fire Department.

Some of the most recent indicators of lack of performance are listed below:

(1) Failure to release new/renewal business licenses for approval in a timely manner, causing undue delays in processing customers' requests. This has been an issue since late in 2018 and you have been notified several times via email and in Staff Meetings.
(2) The GAFC Conference was in Savannah between 03/30/2019 - 04/03/2019. You were in Savannah during the time of the entire conference, but only attended five (5) classes out of twenty-one (21) offered. The first two (2) full days in attendance, you didn't take any classes, which cost travel monies that should not have been spent.
(3) Failure to maintain the Fire Investigator certification required by the Fire Chief job description. You have attended the Arson Investigator class no less than two (2) times at the expense of the City but have failed to maintain the certification.

The foregoing constitute the following grounds for disciplinary action (including discharge) under the City's personnel policy: 8.1 D (2), (5), and (9).

Pursuant to policy: 8.1 H (1), as a department head, you are not entitled to an appeal. However, 8.1 H (3) authorizes a public name clearing at your request before the mayor and council. The purpose of such a hearing is not to offer an appeal of this decision but is to provide you with an opportunity to clear your name, reputation, and integrity. If you desire such a hearing, you must file a notice with the City Clerk.

This termination is effective immediately (June 4, 2019).

Sincerely,



Derick W. Hayes
City Administrator